Filed 7/16/14  P. v. Jackson CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DERRICK E. JACKSON,<br><br>     Defendant and Appellant. | A135488<br><br>(Contra Costa County<br>Super. Ct. No. 5-111550-0) |

Derrick E. Jackson (appellant) was convicted, following a jury trial, of one count each of using a minor for commercial sex acts, possession of obscene matter depicting minors engaging in or simulating sexual conduct, furnishing methamphetamine to a minor, and possession of methamphetamine, as well as three counts of unlawful sexual intercourse.  On appeal, he contends (1) the trial court abused its discretion and violated his constitutional rights to due process and a fair trial when it removed his first attorney due to a perceived conflict of interest, and (2) the trial court abused its discretion when it denied his motions for a mistrial and a new trial on the three unlawful sexual intercourse counts due to prosecutorial misconduct.[1]  We shall affirm the judgment.

### PROCEDURAL BACKGROUND

Appellant was charged by amended information with one count of using a minor for commercial sex acts (Pen. Code, § 311.4, subd. (b)[2]—count 1); one count of

_____

[1]  Appellant has withdrawn a third contention in which he had argued that his sentence constitutes cruel and unusual punishment.

[2]  All further statutory references are to the Penal Code unless otherwise indicated.

1

possession of obscene matter depicting minors under the age of 18 engaging in or simulating sexual conduct (§ 311.1, subd. (a)—count 2); one count of human trafficking of a minor (§ 236.1—count 3); one count of pandering for prostitution (§ 266i, subd. (a)—count 4); one count of furnishing a controlled substance (methamphetamine) to a minor (Health & Saf. Code, § 11380, subd. (a)—count 5); one count of selling, distributing or transporting a controlled substance (Health & Saf. Code, § 11379, subd. (a)—count 6); one count of possession of a controlled substance (methamphetamine) (Health & Saf. Code, § 11377, subd. (a)—count 7); and three counts of unlawful sexual intercourse (§ 261.5, subd. (c)—counts 8, 9 & 10). The information further alleged that appellant had two prior serious felony convictions (§ 667, subd. (a)(1)) that also qualified as "strikes" (§§ 667, subds. (b)-(i), 1170.12), and had served two prior prison terms (§ 667.5, subd. (b)).

Following a jury trial, the jury found appellant guilty on counts 1, 2, 5, and 7 through 10. The jury found appellant not guilty on count 6, and was unable to reach a verdict on counts 3 and 4. The court declared a mistrial on counts 3 and 4.

Appellant waived his right to a jury trial on the prior conviction allegations, and the court found them true.

On April 27, 2012, the trial court sentenced appellant to a total term of 35 years to life in state prison.[3]

Also on April 27, 2012, appellant filed a notice of appeal.

### FACTUAL BACKGROUND

On an evening in September 2010, when she was 16 years old, Jane Doe[4] was walking on 15th Avenue near International Boulevard in Oakland. She had run away from a group home and was working as a prostitute. She was looking for a prostitute friend when she first saw appellant, who was a passenger in a black van; another man she

---

[3] The court struck the two prior prison term enhancements and dismissed counts 3 and 4.

[4] The witness was referred to as "Jane Doe" to preserve her privacy.

later learned was "Rio," was driving. The men were following her, trying to get her attention, but she ignored them. A short time later, she saw the men walking down a hill as she walked up it on the other side of the street. Doe asked appellant if she could use his phone, and appellant brought it to her. Appellant asked Doe "how much" for a blowjob, and she said, $40. He also asked how old she was and she told him she was 16. He kept asking her how old she was because he did not believe she was 16, but she continued to tell him that was her age.

Appellant and Doe agreed to go to a nearby hotel, where appellant rented a room. Inside the room, appellant used a pipe to smoke a drug that looked like salt. He also blew some of the smoke into Doe's vagina. Appellant and Doe had sexual intercourse twice that night and Doe began to feel dizzy and "not like herself." She passed out and woke up the next morning feeling drowsy. She believed this was from the smoke from the drugs. She did not recall how, but she ended up in the black van and later woke up to find herself at appellant's house in Concord. She was in appellant's bed, naked, and could feel that there had been additional intercourse.

Appellant would not let Doe leave his bedroom that day, grabbing her aggressively when she tried to do so. That night, appellant had intercourse with her again. She did not want to do it, but felt she had no choice. Appellant first put his penis, and then a vibrator, inside her vagina. He tried to have anal sex with her too, but could not penetrate. He then smoked the salt-like drug and gave some to her. It was the first time she had smoked this drug.

Later that night, appellant gave Doe some clothes to wear and he took her "out to prostitute" herself. He had asked to be her pimp and she felt she could not say no or he would hurt her. Appellant asked her how much she charged for certain things, and then told her to charge more. Once she was out on the street in the place appellant told her to stand, Doe ran and appellant chased her. He caught up to her at the Concord BART station, where he grabbed her and showed her a black gun. He had the gun in a strap that went over his shoulder; it was bigger than a handgun with a long barrel. Doe was afraid appellant would use the gun on her. Rio drove up in the black van and then drove them

3

all back to appellant's house, where appellant had sex with her again.  She again felt like she had no choice because she was afraid of appellant and the gun.

Appellant never took Doe back out onto the streets of Concord.  Instead, he told her they could "make more money off of [the] Internet."  About a week after she arrived at his house, appellant started taking pornographic pictures of Doe, initially without any clothes on.  Later, he would hand her an outfit and tell her to get into different poses and positions while taking pictures.  She felt like she had to do what he said.  He used a cell phone and sometimes a camera to take the photographs.[5]

On one occasion, appellant videotaped her after asking her to do things like a handstand and the splits.  He had her undress completely first and told her to do the splits on top of him.  He took his penis out of his pants and made her "do the splits on it."  He referred to her doing the splits "on the jackpot."  Appellant wanted to have sex while she was doing the splits, but he was unable to put his penis inside of her.  He ended up having intercourse with her after he finished videotaping her doing the splits.  The video about which Doe testified was played for the jury and received in evidence.

Appellant continued to have sexual intercourse with Doe every day or two.  He also put his fingers and dildos in her vagina and attempted to put the dildos in her anus.  She continued to have sex with appellant because she felt she had no choice and was afraid.  When she refused sex he got angry with her.  At times, when he was angry, he had hit her face and pulled her hair.  One night when she said no, he yelled and told her to get "face down, ass up" and tapped her with a stick.  He also took his gun out of the closet, though he did not directly threaten her with it.  Appellant also told Doe to clean his room and the kitchen and got angry when she said no.

Doe also had sexual intercourse with Rio while she was at the house.  She did not want to, but felt she had no choice.  When appellant was out of the house, she felt like Rio was watching her to make sure she did not leave.  Appellant also brought another

---

[5] Thirty-eight photographs, which Doe testified appellant had taken of her, were received in evidence.

4

man to the house who would pay him to have sex with Doe. Before the man came over, appellant would make her get dressed in clothes he had at the house. Rio and appellant also gave her the salt-like substance to smoke more than once a day. In addition, appellant injected her in the arm with a needle "multiple times."

Doe did not feel like she could leave appellant's house. She did not know her way around Concord and she believed that, if she left, appellant would try to find her and, if he found her, he would hurt her. She could not go to her father because he had done some bad things to her. She also did not trust the police.

At some point, more than a week after Doe arrived at appellant's house, a girl named Sammy showed up with some other people. Sammy ended up staying at the house for three or four days, until the police came. Doe and Sammy became friends. Doe trusted her and told her what had been happening to her and that she was scared. Sammy tried to talk Doe into leaving the house with her, but Doe did not feel like she could leave.

Three days after Sammy arrived, Doe went with her to Safeway so that they could talk privately. From there they went to a marina where they smoked marijuana with some guys there. Eventually, Doe decided she had to return to the house because she was afraid that appellant would find her and hurt her if she did not go back. When they got back, appellant yelled at both her and Sammy about being gone so long.

Two days later, the police showed up. During those two days, appellant had sexual intercourse with her and gave her the pipe to smoke. On the day the police came, Doe broke the pipe because she did not want to smoke anymore.

When the police officers arrived, Doe was in appellant's bedroom, but she heard appellant tell Rio to hide the drugs before letting the officers in. Eventually, appellant called for her to come out of the bedroom; he called her "J[.]," which he had told her was his daughter's name. Doe came out of the bedroom wearing a robe. She told the officers that she was appellant's daughter because she was nervous and "under the influence" of appellant. Doe felt nervous with appellant watching her, so she again said that she was his daughter and gave a date of birth.

5

After one of the officers took Doe outside, she gave him her real name and date of birth, and said she was a runaway. She was not honest in other things she told the police then, or later at the police station, because she was afraid of appellant finding out and coming after her. For example, she told police she came to the house in Concord by bus and BART. She said that Rio, not appellant, had slapped her, given her methamphetamine, photographed and videotaped her, forced himself on her sexually, and taken her to the streets of Concord to solicit. Doe also told police she had not had sex with appellant, that appellant thought she was 17, and that he would not touch her because she was a minor.

Samantha H., who was 20 years old at the time of trial, testified that she went to appellant's house in Concord "[t]o consume illegal drugs." She had no place else to stay that night and ended up staying there four days at appellant's invitation. While at the house, Samantha met a young female—Jane Doe—who looked like she was about 13 years old, but said she was older. Doe did not interact much, but would come out of appellant's bedroom to cook, and then return to the bedroom. It seemed like Doe also "watched herself" around appellant. Doe told Samantha that if she (Samantha) stayed at the house, appellant would expect her to do what he had Doe doing, i.e., "prostituting" herself.

One day, Doe accompanied Samantha to the store and, after leaving the house, Doe seemed "free," like she "was a whole different person, and she told me she didn't want to be there but she couldn't leave." Samantha told Doe some friends were going to pick her up to go to the marina, and invited Doe to come. They went to the marina, where they smoked marijuana. As it began to get dark, Doe suddenly seemed "freaked out," saying appellant would be up and she had to go back. She said she had to return to the house because appellant "would find her."

It seemed to Samantha that Doe was "controlled" by appellant. Doe told her that appellant had thrown a flashlight at her. Doe also told her that she and appellant were having sexual intercourse and that appellant used a metal "cock ring" to "go longer" when they had intercourse.

6

One night while Samantha was staying at the house, appellant gave both her and Doe methamphetamine, which they smoked. Appellant took photographs of them smoking.

After Samantha had been at appellant's house for four days, he told her that, if she wanted to stay there, "I would have to do the same as Jane Doe and make a redbook and that we would take pictures, and he'd set up dates, and that's how I could stay in the house." She described redbook as "a place on the Internet where they sell females." Because she did not want to do any of this, Samantha decided to leave. She left appellant's house earlier on the same day the police came.[6]

Concord Police Officer Paul Van Diver, testified that, on September 24, 2010, he and two other officers went to appellant's home to look for Mario Cano, also known as "Rio." After Van Diver knocked on the front door "multiple times," appellant opened the door. Van Diver said he needed to speak with Cano and asked if he was in the house. Appellant said that Cano had just left the house, but invited the officers to " 'come on in and take a look' " inside. He then led the officers to bedrooms in the back of the house. The officers found Cano hiding in a closet in one of the bedrooms.

Van Diver asked appellant if anyone else was in the house, and appellant said no. While Van Diver was with appellant and Cano in the living room, however, another officer shouted that he heard sounds coming from the master bedroom. Appellant then began to yell to "G" to get dressed and " 'come on out.' " He said, " 'It's cool. It's my daughter.' " A young female (Jane Doe) came out of the master bedroom. She was "in disarray," and looked groggy and sick. Van Diver believed she was 16 or 17 years old.

The officers conducted a protective sweep of the house. In an open drawer in appellant's bedroom, they found a plastic bag containing white crystals that appeared to be crystal methamphetamine. When Van Diver showed appellant the baggy, appellant

---

[6] Samantha acknowledged that she had been previously convicted of driving a stolen vehicle and possessing stolen materials, and that she had received immunity for her testimony at appellant's trial.

7

responded, "you found the crank in my dresser drawer" and indicated that it was his. Officers also found a baggy of what appeared to be marijuana and another baggy of what appeared to be crystal methamphetamine in appellant's pocket.[7]

Van Diver turned his attention to Jane Doe and asked for her name. Appellant said she was sick, and Doe agreed. Van Diver asked her for identification, but she said she had none. Doe "clammed up" and would not speak to the officers, and appellant gave them her supposed name and date of birth. The officers were suspicious of this information and were eventually able to take Doe out to the front porch, away from appellant, where she provided them with her true name and date of birth, and said she was a runaway. Doe told the officers she had not eaten in days and was extremely thirsty. She looked very tired, lethargic, and emaciated. The officers took Doe to the police station, where they gave her food and water. They also notified Child Protective Services.

The officers arrested appellant, who said that he would need his phone because it had all of his phone numbers on it. The phone was later taken into police custody. At trial, Van Diver identified a phone the prosecutor showed him as the phone appellant asked to take with him after his arrest.[8]

A subsequent search of appellant's house was conducted after his arrest. Items found during the search of appellant's bedroom included a "cock ring" found on appellant's bed, a broken glass pipe used for smoking methamphetamine, KY jelly, vibrators and dildos, unopened condoms, many pornographic videos, and a pornographic magazine. A flashlight located near appellant's beside table was not seized.

A criminalist analyzed blood samples taken from Jane Doe the day after appellant's arrest, which tested positive for methamphetamine.

---

[7] A criminalist performed tests on the substances inside the baggies, and testified that the baggy found in appellant's dresser drawer contained 2.35 grams of methamphetamine. One of the baggies found in appellant's pocket also contained 0.07 grams of methamphetamine.

[8] Pornographic photographs of Doe were found on the phone.

Jeff Soler, an inspector with the district attorney's office, testified that, on March 1, 2012, he and the prosecutor met with Samantha H., who gave a statement about what had occurred while she was at appellant's house in 2010. Samantha said that, when she met Doe, it was clear to her that Doe was a minor. Doe and appellant spent most of their time in appellant's bedroom, over the few days that Samantha was at the house. Samantha only saw Doe outside of the bedroom during meal times in the kitchen, where appellant would sit at the table and "just stare" at Doe. At some point, Doe told Samantha she was "prostituting" for appellant and that, if Samantha stayed at the house, appellant would expect her to prostitute herself as well. Doe also told her about appellant's "cock ring." Samantha told Soler and the prosecutor that appellant was controlling Doe. She also said that there were a lot of drugs being used while she was there, that it was mainly appellant who supplied the methamphetamine, and that Doe used appellant's pipe to smoke methamphetamine.

Samantha told the prosecutor and the inspector that, when she went to Safeway and then to the marina with Doe, Doe opened up and said she was only comfortable leaving the house because appellant was asleep. Doe described being beaten by appellant with a flashlight. Doe also said she was only 14 or 15 years old and could not leave appellant because appellant would find her and bring her back. During their outing, Doe became scared that appellant would find out that she was gone from the house. Samantha described Doe as "a little girl trapped with nowhere to go."

Oakland Police Officer Jason Skadlant testified as an expert in the area of sexual exploitation of minors, pimping, pandering, and prostitution. Skadlant described the "rules of the game" with pimps and juvenile prostitutes. The pimps usually set up a pricing scheme and often put photographs of the prostitute on Internet sites, such as myredbook.com in the Bay Area, to facilitate obtaining clients. Internet prices are usually higher than street prices. Some of the photographs appellant took of Jane Doe were consistent with the type of photos found on myredbook.com.

Skadlant testified that, with juvenile prostitutes, there are generally two recognized types of pimps: the "Casanova pimp" and the "guerilla pimp." There is usually some crossover between the two types.

The Casanova pimp has "kind of a boyfriend-type relationship before it progresses to the stage of now you're prostituting for them." The guerilla pimp might kidnap a girl off the street and take her to an unfamiliar place, to create a sense of reliance on the pimp. He might be the first one to sexually assault the girl, followed by his associates or other people he charges for the sex. Guerilla pimps tend to dominate the girl right away, and physical violence is common.

The pimp of a juvenile prostitute will commonly use drugs as part of controlling the girl. He might also show the girl pornography and get her intoxicated to lower her inhibitions, and then perform different sex acts with her, as a way of getting her comfortable with the acts and preparing her to do the acts with other men. Finally, juvenile prostitutes are indoctrinated to lie to police to protect their pimp.

When presented with a hypothetical question that reflected the facts of the present case, Skadlant testified that the situation described was familiar to him, and he believed it sounded like a "guerilla-pimp-type of scenario."

## *DISCUSSION*

### I. *Removal of Appellant's Prior Counsel*

Appellant contends the trial court abused its discretion and violated his constitutional rights to due process and a fair trial when it removed his first attorney due to a perceived conflict of interest.

### A. *Trial Court Background*

During a break in jury selection for appellant's trial, the parties and the trial court discussed an issue that had arisen regarding a possible conflict of interest. Appellant's counsel, Alternate Deputy Public Defender Barney Berkowitz, had advised the court that prospective prosecution witness Samantha H. had a pending criminal case and that he had been assigned to represent her in that case. Berkowitz further advised the court that his

10

office had notified the conflicts panel that they were recusing themselves from that representation.

The prosecutor stated that Samantha had three pending criminal cases, for: (1) unlawful taking or driving of a motor vehicle (Veh. Code, § 10851) and possession of stolen property (Pen. Code, § 496, subd. (a)); (2) possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)) and possession of a smoking device (Health & Saf. Code, § 11364); and (3) a probation violation, "for another arrest of moral turpitude." The prosecutor believed that Berkowitz was Samantha's attorney on the cases, although the second case had Kirk Athanasiou listed as counsel. The prosecutor also stated that motions had been filed in the second case.

Berkowitz clarified that all of Samantha's cases had been assigned to him, and that Athanasiou was a lawyer in his office who appeared for him on the cases. Berkowitz did not believe that he had filed any motions in any of her cases, other than an informal discovery request in one of them. The prosecutor responded that it appeared from the case docket that "a couple motions" had been filed.

The court expressed the belief that, with past representation, there is a presumption of a conflict of interest "unless established otherwise," under California law. The court stated that there were two ways in which Berkowitz could continue to represent appellant. First, Berkowitz could "establish to the court's satisfaction that no confidential information was ever received by any member of his office, and I'm not going to make that decision based on simply a statement of, 'To the best of our knowledge there were no motions.' " Second, appellant could provide a waiver of any conflict. Appellant stated that he was not prepared to provide any waivers. Nor did he accept the court's offer to simply "[reset] the case for an ample time for you to be appointed a new attorney."

The court therefore went forward with an in camera hearing, during which Berkowitz said that he could not recall Samantha H.'s stolen property case and believed he had only been counsel on her drug case for a month or two. He believed Kirk Athanasiou had appeared for him on the drug case the prior week. He had also submitted

11

an informal discovery request in one of the cases, though he could not remember which one.

Berkowitz further stated that he had no independent recollection of having met Samantha and that attorneys in his "very small office" did not meet with prospective clients prior to referral. He had not asked Athanasiou about any conversation he had with Samantha, but he doubted there had been any substantive conversation between them since Athanasiou had no instructions to elicit any information. Berkowitz reiterated that he did not believe he had ever met Samantha, but also said, "Now, if there was a docket and minute in the file that showed Berkowitz appearing with her, I would stand corrected. And I'm a little concerned only because Ms. Blumberg [the prosecutor] thinks that she's been represented for a year on one of the cases. I mean, you know, I could have just totally forgotten this."

After the in camera hearing, the trial court announced that what it had learned in camera was insufficient to overcome the presumption that Berkowitz and his office had confidential information regarding Samantha. But the court gave Berkowitz time to review the minutes of Samantha's cases, and also requested that Attorney Athanasiou be present for another in camera hearing.

During the subsequent in camera hearing, held later that same day, Athanasiou told the court that he had had conversations with Samantha, but they "were limited to court dates and the discussion of her right to have a preliminary hearing, when to have that, whether or not to waive her right to have a speedy hearing, when to set the subsequent date." Both attorneys assumed that, to their knowledge, they had not had any substantive conversations with Samantha about her case or criminal record. Athanasiou added that he "may have explained her charge to her, but . . . didn't discuss anything about the contents of the police report, did not discuss her record."

Following the in camera hearing, the trial court offered its tentative view that, to overcome the presumption of a conflict of interest, "there would have to be no communications between the conflicting person and the attorney. I don't think the state of California law is such that the court can allow the attorneys to make a judgment based

12

upon what conversations and involvement they've had as to whether it might contain confidential information. Even the reaction, it seems to me, of someone when told what the charges are could be confidential information." The court then announced that Berkowitz would be removed as counsel and further explained the basis for its ruling: "And what I'm facing, and I want the record to show, is [Samantha] would come here, look out there and see her attorney and know that she's been told that he's no longer— that he quit, that he's no longer her attorney, but that would leave an impression in the mind of that person that the system isn't fair." Counsel Berkowitz objected to the court's ruling.

Later that same day, January 3, 2012, Christopher Martin was appointed as appellant's attorney and received discovery. Appellant's trial began on March 2, 2012.

### B. *Legal Analysis*

"The Sixth Amendment right to effective assistance of counsel under the federal Constitution includes the right to representation free from any conflict of interest that impairs counsel's efforts on behalf of his or her client. [Citations.] We have recognized that counsel's current or prior representation of a witness may create a conflict, because counsel bears professional responsibilities both to the witness and to the client and may have confidential information concerning his or her representation of the witness. [Citations.] But when the attorney has not received any pertinent confidential information from the witness, ordinarily there is no actual or potential conflict of interest. (*People v. Cornwell* (2005) 37 Cal.4th 50, 74-75 (*Cornwell*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) In recent years, the California Supreme Court has rejected rigid rules for disqualification based on a presumption that counsel has obtained confidential information and had begun developing flexible strategies for dealing with potential conflicts. (See *Cornwell*, at p. 75; *People v. Lawley* (2002) 27 Cal.4th 102, 146; *People v. Clark* (1993) 5 Cal.4th 950, 1001-1002, disapproved on another ground in *Doolin*, at p. 421, fn. 22; see also *Rhaburn v. Superior Court* (2006) 140 Cal.App.4th 1566, 1577-1578 (*Rhaburn*) [discussing Supreme Court cases].)

13

In considering a motion to disqualify counsel, "the 'paramount concern is the preservation of public trust in the scrupulous administration of justice and the integrity of the bar.' [Citation.] On review, the standard is 'abuse of discretion.' [Citation.] The party resisting disqualification bears the burden of establishing the facts making disqualification inappropriate, and we 'accept[] as correct all of [the trial court's] express or implied findings supported by substantial evidence.' [Citation.]." (*Rhaburn*, *supra*, 140 Cal.App.4th at p. 1573, fn. omitted.)

Here, appellant argues that the trial court improperly *presumed* a conflict existed based solely on the representation of potential witness Samantha H. by appellant's counsel Berkowitz, even though Berkowitz had informed the court that he had received no confidential information from Samantha. Respondent counters that "[t]here existed a potential if not actual conflict here" in that Berkowitz said only that he did not believe he had met Samantha and both Berkowitz and Athanasiou said only that "to their knowledge" they had not had any substantive conversation with her about her cases or criminal record.

Even assuming appellant is correct that the trial court improperly removed Berkowitz as appellant's counsel, as we shall explain, the error was harmless.

Appellant first claims that the alleged error was structural. He acknowledges, however that we are bound by *People v. Noriega* (2010) 48 Cal.4th 517, 525 (*Noriega*), in which our Supreme Court held that a trial court's error in replacing a defendant's appointed counsel with another court-appointed attorney is not subject to automatic reversal, but instead is subject to harmless error analysis pursuant to *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (See *Noriega*, at p. 524 [discussing Code of Civil Procedure section 128, subd. (a)(5), which provides statutory basis of trial court's authority to disqualify an attorney]; see also *Auto Equity Sales v. Superior Court* (1962) 57 Cal.2d 450.)

Appellant alternatively argues that his second attorney's failure to adequately object to and seek an admonition regarding the prosecutor's improper rebuttal argument

14

to the jury (see Pt. II., *post*) demonstrates that disqualification of Berkowitz constituted a violation of his constitutional rights.

Replacement of an appointed attorney with another appointed attorney can violate the Sixth Amendment's right to counsel only if "replacement counsel's representation ' "was deficient when measured against the standard of reasonably competent attorney and . . . this deficient performance caused prejudice in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' . . ." ' [Citation.]" (*Noriega*, *supra*, 48 Cal.4th at p. 522.) Here, as we shall explain in Part II., *post*, of this opinion, not only did appellant's attorney vigorously object to certain comments by the prosecutor, no prosecutorial misconduct in fact occurred. Hence, appellant has not demonstrated any federal constitutional violation.

Finally, appellant argues that it is reasonably probable that a more favorable outcome would have occurred had the trial court not replaced Berkowitz with another attorney. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) He implies that replacement counsel Martin was not as well prepared for trial as Berkowitz, observing that Berkowitz had over 15 months to prepare while Martin had only two months. This is speculation. Martin expressed no concern about the time frame; nor did he claim a lack of readiness for trial.[9] Moreover, appellant has made no showing that Martin's performance at trial was deficient in any way. (See Pt. II., *post.*)

---

[9] Appellant asserts that "[t]his very short period of preparation is even more troubling in light of Martin's declaration to the court that but for the extraordinary circumstances of the case he would not have declared he was ready for trial." Appellant, however, completely misconstrues the discussion between counsel and the court on March 5, 2012, two months after Martin's appointment, in which Martin hypothesized that, had he been brought into court immediately after the court made its disqualification ruling, he would have declared he was ready for trial—even though he could not possibly have been ready—because he understood that the prosecution was not ready to go forward. Such a declaration, he believed, would have served his client because it would have supported an argument that appellant's speedy trial rights were violated. Martin never suggested he was not currently ready to proceed with trial.

15

In sum, any possible error on the part of the trial court in disqualifying appellant's first appointed attorney due to a perceived conflict of interest was harmless. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

## II. *Prosecutorial Misconduct*

Appellant contends the trial court abused its discretion when it denied his motions for a mistrial and a new trial on the three unlawful sexual intercourse counts due to prosecutorial misconduct, resulting in a denial of his constitutional rights to a fair trial and due process. Specifically, appellant asserts the prosecutor mischaracterized the evidence in the video showing Jane Doe doing the splits on appellant by claiming that appellant's penis was visible in the video.

### A. *Trial Court Background*

Near the end of his closing argument, defense counsel told the jury that the photographs appellant took of Doe "suggest[]" that he had sex with her, but did not prove it beyond a reasonable doubt. He noted that appellant had taken similar photographs of Samantha H., who had testified that she and appellant never had sex.

During her rebuttal argument, the prosecutor addressed defense counsel's argument regarding the three counts of unlawful sexual intercourse, as follows:

"But let's talk about what he was talking about as far as that she's a liar to counts 8, 9, and 10, the unlawful sexual intercourse with the defendant, Derrick Jackson.

"He told you there's no proof that they ever had sexual intercourse. There's no proof that he was ever undressed in any of those photographs. There's no proof that he intended anything different with those photographs than just to take them of her. In fact, he has proof to the contrary, let me show you Samantha H[.'s] photographs and that will just prove to you that Jane Doe is a liar. The prosecution didn't give you anything to say that there was any sexual intercourse whatsoever.

"I think there was [*sic*] overlooking one significant piece of evidence, and perhaps I did a bad job in this trial pointing it out to you when it actually got played, but I'm going to slow it down for you right now so that you can see it yourself.

16

"People's Exhibit 40. Let me place this in context about what I'm going to show you. The defendant says[,] I don't care where it goes down there. Let's do it. That's her fault. She didn't put enough lotion on her shit. "My niggas, you know you want to see this shit.

"That's not cool, Jane Doe said. [¶] Defendant[:] my niggas, you know you all wanna see this. And Jane Doe in a very quiet voice says something you can't hear on the tape. But the defendant comes back in his booming voice and says, shit, that's the coolest thing this side of the Mississippi. You don't think other niggas want to see that ass do the splits. You gonna be famous. Why wouldn't I want to see it in person? She has no answer for that one, he screams into the tape. She said nothin'.

"And Jane Doe says something again that you can barely hear, and you hear the quiet whisper of, you just want to lay right there? Yeah, I do. I have a plan. Bounce up and down. Bounce. Jane Doe, I don't think I can do it. Defendant orders her[:] you fitta try. We gonna practice. Practice makes perfect. And he starts singing in a happy tone. Jane Doe again says in her voice[,] I don't think I can do it. And the defendant laughs into the camera and says she's scared of the jackpot. Do it again. One more time. Come on. Come on. [¶] This is right when Jane Doe first gets on top of the defendant's lap. . . .

"Well, let's take a slowed-down version of People's Exhibit 40, and the defense's assertion there's no evidence that there was sexual intercourse.

"I'm going to direct you in this video—and I apologize, it's dark, and it's even darker in the actual tape—but if you take a close look, you're going to watch this region down here in the tape. Okay. . . . Here's a half-time slowed-down version. And if you watch very closely, there's the defendant. She goes down on his lap. That's the defendant's penis right there in that tape. Probably went unnoticed the first couple of times, but when you slow it down and take a look, it's undeniable, unrefutable—"

At that point, defense counsel interjected, "Your Honor, we definitely need to approach at this point."

After an unreported sidebar, the court told the prosecutor to continue, which she did as follows: "—unrefutable evidence. [¶] So when you take a look at a whole of [*sic*]

17

what defense counsel stood up here and told you in closing argument, take a close look at what the evidence already shows you and what is before you.

"I talked to Jane Doe when she was on the witness stand about this particular event, and I asked her the questions about what happened during that video. She told you that after the time that he was filming her having the splits done on top of him, she said was one of the times there was unlawful sexual intercourse.

"Let me remind you of what the defendant's last statements were as this video finished. Quote, we'll be back in, like, fifty pumps, we'll be back. Together with the video, that is proof beyond a reasonable doubt that the defendant had unlawful sexual intercourse with Jane Doe.

"With that in mind, that girl that took the stand here and told you her story, she was not a liar. I told you in opening statement that a picture is worth a thousand words, and I guess in this terms [*sic*], a video is worth ten thousand."

Subsequently, defense counsel moved for a mistrial, arguing: "In the prosecutor's quote/unquote, rebuttal, she performed an experiment where she slowed down the tape and told the jury that what they were watching was the defendant's penis when, in fact, what was in the picture was Miss Doe's arm moving back and forth behind her leg. [¶] I vehemently objected, asked for a mistrial, and at this point, this is the most flagrant prosecutorial misconduct I have ever witnessed. . . ." Counsel expressed shock at the prosecutor's "absolute blatant misrepresentation in a manner that . . . will absolutely taint this jury."

The court responded: "Well, but, Mr. Martin, I reviewed the video along with everyone else just now. It did not look like her arm. It looked like a penis. Now, that's something that the jury will have to decide. That's a factual determination they will have to—" Counsel then interjected that the jury would not have video equipment to replay the video in slow motion. The court replied, "But they will have the video. They're going to have the laptop, and they can slow down the video." When counsel said that he was "flabbergasted" by the "flagrant violation of everything that this court stands for," the court again said, "Mr. Martin, it looked like a penis to me. They'll be able to make

18

that determination.  [¶]  I'm not the trier of fact, but that is what it looked like to me."
The court then confirmed that the jury would have access to a laptop on which they
would be able to slow down and review the video if they so chose, before denying the
mistrial motion.

The following morning, defense counsel informed the court that he had reviewed
the video "frame by frame, and it is absolutely without a doubt, Miss Doe's left arm."
The court again rejected counsel's claim that the prosecutor committed misconduct by
misdirecting the jury during rebuttal by describing Doe's forearm as appellant's penis.
The court reiterated that "that's your interpretation of the evidence.  You are not the trier
of fact.  Neither am I.  [¶] . . . [¶] . . . [T]he jury is the trier of fact.  They have that
evidence.  They will have to review it and make that determination."

Defense counsel later filed a motion for new trial, in which he renewed his claim
of prosecutorial misconduct and included a declaration by George Reis, a consultant in,
inter alia, forensic video analysis.  In his declaration, Reis stated that he had testified in
court numerous times as an expert in forensic video analysis.  He further stated that he
had reviewed the video in question, performing a frame-by-frame analysis of the relevant
portion, and concluded that "the object is consistent with the right arm and hand of the
female, and inconsistent with a penis."

The court denied the new trial motion, reiterating that it did not find that the
prosecutor had behaved inappropriately, but was simply "making [an] argument,
commenting on the evidence, asking the jury to draw inferences from the evidence.  It's
their decision in terms of determining what it is that they are seeing."

### B.  *Legal Analysis*

"A trial court should grant a mistrial only when a party's chances of receiving a
fair trial have been irreparably damaged, and we use the deferential abuse of discretion
standard to review a trial court ruling denying a mistrial.  [Citation.]" (*People v. Bolden*
(2002) 29 Cal.4th 515, 555.)

Similarly, " ' " [t]he determination of a motion for a new trial rests so completely
within the court's discretion that its action will not be disturbed unless a manifest and

unmistakable abuse of discretion clearly appears.' " [Citations.] " '[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background.' " ' [Citation.]" (*People v. Howard* (2010) 51 Cal.4th 15, 42-43.)

In the present case, both the motion for a mistrial and the new trial motion were based on the prosecutor's alleged mischaracterization of the evidence when she stated in her rebuttal argument that appellant's penis was visible in the video, and that this evidence corroborated Doe's testimony that appellant had sexual intercourse with her.

The California Supreme Court has explained that " ' " '[a] prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it " ' "involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*).) The defendant need not show that the prosecutor acted in bad faith. (*Id.* at p. 822.)

Our Supreme Court has further observed that " ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] . . .' " ' " [¶] Prosecutors, however, are held to an elevated standard of conduct . . . 'because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state. [Citation.]' " (*Hill*, *supra*, 17 Cal.4th at pp. 819-820.) In evaluating a claim of prosecutorial misconduct based on a prosecutor's comments to the jury, we must determine whether "there is a reasonable possibility that the jury construed or applied the prosecutor's comments in an objectionable manner. [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 132-133 (*Valdez*); *People v. Berryman* (1993) 6 Cal.4th 1048, 1072, overruled on another ground in *Hill*, at p. 823, fn. 1.)

20

With respect to claims that a prosecutor has misstated or mischaracterized evidence, the court has explained: "While counsel is accorded 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation],' counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]. ' "Whether the inferences the prosecutor draws are reasonable is for the jury to decide." ' [Citations.]" (*Valdez*, *supra*, 32 Cal.4th 73, 133-134.)

In *Valdez*, the court rejected the defendant's claim that the prosecutor's characterization during closing argument of witnesses' testimony was misconduct, explaining: "In this case, the prosecutor's comments did not mischaracterize or assume facts not in evidence, but merely commented on the evidence and made permissible inferences. [Citation.] The prosecutor here did not misstate the witnesses' testimony or state that the witnesses did not ask the jury not to impose the death penalty. Rather, it is clear that the argument was based on the prosecutor's interpretation of the evidence— e.g., the witnesses' tepid testimony, their demeanor, and their relationship to defendant. [Citation.] [¶] Moreover, there was no danger that the jurors believed the prosecutor was aware of facts to which they were not privy. [Citation.] [¶] Given this, there is no reasonable basis to conclude the prosecutor's argument skewed the jury's decision toward imposing the death sentence or diminished the jury's sense of responsibility. [Citation.]" (*Valdez*, *supra*, 32 Cal.4th at p. 134.)

Likewise, in this case, the prosecutor did not mischaracterize the evidence. Rather, she made inferences based on her interpretation of the evidence, i.e., that what appeared to *her* to be appellant's penis was visible in the video. (See *Valdez*, *supra*, 32 Cal.4th at p. 134.) Indeed, the court found as a factual matter that the video was susceptible to the prosecutor's interpretation, and appellant has not shown that the court's findings were not supported by substantial evidence. (See *People v. Taylor* (1984) 162

21

Cal.App.3d 720, 724 [trial court's factual findings, express or implied, made on a motion for new trial, are upheld if supported by substantial evidence].)**10**

The prosecutor's use of the terms "undeniable" and "unrefutable" [*sic*] to describe what she saw on the video does not undermine this conclusion. She was plainly stating her own opinion of what the video showed, and such remarks typify the kind of "vigorous" comment on the evidence that is standard in closing arguments. (*Hill*, *supra*, 17 Cal.4th at pp. 819-820 [a prosecutor's " ' " 'argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom' " ' "] accord, *People v. Thomas* (1992) 2 Cal.4th 489, 526 [" '[T]he prosecutor has a wide-ranging right to discuss the case in closing argument' " and " 'to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper' "].) Indeed, as long as it is based on the record and made in good faith, "counsel have a right to present to the jury their views on the deductions or inferences that the facts warrant. Their reasoning may be faulty, but this is a matter for the jury to decide. [Citation.]" (*Farmer*, *supra*, 47 Cal.3d at p. 923, overruled on another ground in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6; accord, *People v. Rowland* (1992) 4 Cal.4th 238, 277 [prosecutor's "challenged remarks constituted reasonable—if hyperbolic and tendentious—inferences from the evidence"].) The trial court in this case reasonably found that the prosecutor was simply presenting her views on what the evidence showed, and that it was for the jury to review the evidence and decide whether or not she was correct. (See *Farmer*, at p. 923; *Valdez*, *supra*, 32

---

**10** Indeed, the court itself, upon viewing the video, expressed the opinion that appellant's penis was visible therein. That appellant's expert subsequently opined that what could be seen in the video was Doe's forearm, not appellant's penis, merely shows that reasonable minds could differ as to what was depicted. It was for the jury to determine the reasonableness of the prosecutor's proposed interpretation of the evidence. (See *People v. Farmer* (1989) 47 Cal.4.3d 888, 923 (*Farmer*); accord, *People v. Smith* (2003) 30 Cal.4th 581, 617 [whether inferences prosecutor draws are reasonable is for jury to decide].) Nor does the fact that the prosecutor made these comments during her rebuttal argument make them more objectionable than had she offered them during her initial closing argument, given our finding that no misconduct occurred.

Cal.4th 73, 134 [" ' "[w]hether the inferences the prosecutor draws are reasonable is for the jury to decide" ' "].)

The court also instructed the jurors with CALCRIM No. 104, which informed them, inter alia, that counsel's comments during closing argument were not evidence and it was for the jury to determine what the facts were.[11] We presume the jury followed the court's instructions in this regard. (See *Valdez*, *supra*, 32 Cal.4th at p. 114, fn. 14.)

In sum, because "there is no reasonable basis to conclude the prosecutor's argument skewed the jury's decision" toward finding appellant guilty of unlawful intercourse (*Valdez*, *supra*, 32 Cal.4th at p. 134), appellant has not established that the trial court's denial of his motions for a mistrial and a new trial constituted either an abuse of discretion or a denial of his constitutional rights. (See *People v. Howard*, *supra*, 51 Cal.4th at pp. 42-43; *People v. Bolden*, *supra*, 29 Cal.4th at p. 555; see also *People v. Taylor*, *supra*, 162 Cal.App.3d at pp. 724-725.)

---

[11] CALCRIM No. 104 provides in relevant part: "You must decide what the facts are in this case. You must use only the evidence that is presented in the courtroom or during a jury view. . . . [¶] Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence. . . ."

### *DISPOSITION*

The judgment is affirmed.

 

 

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Brick, J.*

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.